LOBRANO, Judge.
Plaintiff-appellee, Mary Catherine Vivi-ano, sustained severe burns in a natural gas fire which occurred in her Arabi, La. apartment on February 14, 1982.
On January 7, 1983, Viviano brought an action for damages against her landlords and their insurer, United States Fidelity and Guaranty Insurance Company (USF & G), and Louisiana Gas Service Company (LGS).
On April 24, 1985, Viviano, via amended petition, added New Orleans Public Service, Inc. (NOPSI) and Homer Crochet, her landlord’s father, as defendants.
On February 3, 1986, Viviano, via seconded amended petition, added United Gas Pipeline Company (United) as defendant.
Prior to trial, Viviano settled and dismissed her claims against her landlords and their insurer, and LGS, reserving her rights against NOPSI and United.
On February 27, 1989, NOPSI and United filed a joint exception of prescription asserting Viviano failed to timely sue within the one year prescriptive period and failed to allege solidary liability on the part of all defendants. The trial court denied the exception.
Viviano’s claims against NOPSI and United are predicated on their alleged failure to properly monitor and odorize the natural gas supplied to her apartment. She asserts their negligence as well as strict liability for the “defective” gas under their control.
Trial on the merits was held February 21st through March 2, 1989. The jury returned a verdict in favor of all defendants *815 finding Viviano’s conduct sub-standard and the proximate cause of her injuries.[1]
FACTS:
On the morning of February 14, 1982, Viviano left DeLaRonde Hospital where she was employed during the night shift as a nursing assistant. After visiting her mother, she drove to her apartment in Ara-bi. She went to sleep around 11:00 a.m. Later that evening, at approximately 9:30 p.m., Viviano was awakened by a phone call from a friend. She answered the telephone and asked her friend to hold while she lit a cigarette. Sitting on the side of her bed, Viviano lit a match whereupon a pancake-like blue flame formed which, with a “whooshing” flash, filled the room with fire. Viviano was immediately engulfed in flames. In an attempt to extinguish the flames, Viviano pulled down a curtain and wrapped herself in it. In doing so, the rod fell and struck her in the face. She then ran to her neighbor’s apartment to alert her of the fire and to ask for help. Viviano was taken to DeLaRonde Hospital for emergency treatment. Her burns were extensive. She was eventually referred to West Jefferson Hospital’s burn unit.
Viviano appeals the jury verdict asserting the following assignments of error:
1) The trial court erred when it refused to instruct the jury on the doctrine of res ipsa loquitur.
2) The trial judge erred when he denied plaintiff’s motion for judgment notwithstanding the verdict or, alternatively, new trial. The jury clearly misunderstood and misapplied the law when it determined defendants proved by a preponderance of the evidence Cathy Vivi-ano’s conduct was substandard and she was entirely responsible for her own injuries.
3) The trial court erred when it refused to instruct the jury defendants were strictly or absolutely liable.
4) The trial judge erred when he refused to admit as evidence professional publications upon which plaintiff’s expert based his opinion defendants did not meet the standard of care required by statute or by industry standards for odorization and monitoring of odorant levels.
5) The jury erred when it concluded defendants had met the standard applicable to odorization and monitoring of odorant levels in gas.
Defendants NOPSI and United answered Viviano’s appeal asserting:
1) That Viviano’s claims against them prescribed, and, in the alternative,
2) That Viviano failed to prove that either NOPSI or United were in anyway negligent or responsible for her injuries. They also seek damages for frivolous appeal.
The issues for our determination are whether the jury was properly instructed and whether the incorrect or incomplete instructions led to a clearly wrong finding by the jury.
The testimony adduced at trial relative to liability is as follows:
MARY CATHERINE VIVIANO:
Viviano testified that prior to going to bed around 11:00 A.M. on the date of the fire, and upon awakening that evening to answer the telephone, she did not smell the odor of natural gas. She stated that prior to an operation in 1970 to correct a deviated septum in her nose, she had trouble breathing. She also stated she had trouble smelling but only when she had a cold. She testified that gas leaks were never found in her apartment. She stated that two weeks prior to the fire, her mother, while visiting her, complained that her eyes burned. She stated she did not remember her mother complaining of the smell of gas but she did remember complaining to her mother that her gas bill was high. When asked if she could detect the odor of natural gas, she responded “I have no idea”. *816 Upon further questioning she stated that she didn’t know what natural gas smelled like because she had never smelled it and was not familiar with the odor. She also stated that someone else may be able to smell gas whereas she may not be able to smell it.
JUNE VIVIANO:
June Viviano, plaintiffs mother, testified that two weeks before the fire, while visiting plaintiff, she detected the odor of natural gas in the apartment. She stated she brought this to plaintiffs attention but that plaintiff did not smell the gas. She stated that she found it unusual that she could smell the gas but plaintiff could not. Upon cross-examination, Mrs. Viviano’s deposition was read back to her in which she testified that plaintiff had problems smelling odors that most people can smell and that she didn’t find it unusual that plaintiff could not smell the gas in the apartment two weeks before the fire because plaintiff had difficulty smelling odors. When asked to respond to the conflict in her testimony, Mrs. Viviano stated she must have been confused the day of the deposition.
VIVIAN HUDSON:
Vivian Hudson, Viviano’s neighbor who resided in the front apartment, testified that around midday on the day of the fire she smelled the odor of gas in a hallway leading from her kitchen. This hallway is located near the center of the house. She said she checked outside and inside but could not find where the odor was coming from. The odor lasted about one hour. Hudson testified that she reported gas leaks in her apartment approximately two weeks before the fire.
CYNTHIA ARCENEAUX:
Cynthia Arceneaux, Viviano’s neighbor, testified that neither Viviano nor any previous tenants had complained of gas leaks in the apartment. She stated that two plumbers tested and inspected for gas leaks eight days after the fire and found none.
RENE C. DAUTERIVE:
Rene C. Dauterive, a licensed master plumber, employed by Viviano’s landlords testified that from 1977 to shortly before the fire he repaired various gas leaks at 1720 Ay cock Street. His records showed that they were located in the front apartment. As late as February 1,1982 approximately two weeks before the fire he repaired a leak found at the oven control on the front apartment stove. He was unable to verify from his records if he repaired leaks in the rear apartment. Following the fire, he ran pressure tests on the gas lines in Viviano’s apartment and found a small leak, smaller than a pilot light, on the on/off valve in the space heater. He testified that a leak of this size would take a very long time to accumulate a sufficient amount of gas to cause an explosion. GLENN LAUGA:
Glenn Lauga, chief fire marshall for the St. Bernard Parish Fire Department, testified that following the fire he conducted an investigation wherein he questioned Vivi-ano about a possible cause. He stated that she told him she was coming out of the bathroom to answer the phone when she lit a cigarette and the room ignited. When questioned as to why his written statement did not reflect this information, Lauga responded that it was an “oversight”.
ROY LETORT, JR.:
Roy Letort, Jr., assistant fire chief of the St. Bernard Fire Department was accepted by the court as a fact witness only. He was rejected as an expert in fire investigation.
Letort testified that the fire was quickly extinguished and was of low intensity. He opined from the burn pattern that the fire was a gas fire. No ignition source was found and no gas leaks were found. The space heater valve was in the “off” position. Letort stated that he did not smell the odor of gas when he arrived on the scene. He testified that the kitchen ceiling and wall were burned but found the most intense burn area to be in the bedroom in the area of a chair and some newspapers. He opined the fire started in the bedroom area.
RALPH MOUNICOU, III:
Ralph Mounicou, III, assistant commander of the General Assignment Division for the New Orleans Fire Department, investí- *817 gated Viviano’s apartment one week following the fire.
He testified that the fire was a gas fire. He stated there was no indication that the fire was a cigarette or mattress fire. He found the space heater valve and the stove knobs in the “off” position. He found no leaks in the gas line to the stove. He found the heaviest damage to be near the chair and some newspaper located in the bedroom near the space heater. He opined that these ignited after the flash.
DR. EDWIN BRINSFIELD ROSS:
Dr. Edwin Brinsfield Ross, an ear, nose and throat specialist, testified that Viviano had nasal surgery in 1971 to correct a deviated septum. Sometime after this surgery, Viviano was involved in an automobile accident and sustained a broken nose. Dr. Ross testified that on December 1, 1987, he examined Viviano. His examination of her nose revealed an external deviation concave to the right and connex to the left. In addition he found nicotine stains in her nostrils. He stated that nicotine in the nostrils impairs smell. During this examination, Dr. Ross administered a smell test to Viviano. She was able to smell all three tested substances, alcohol, perfume and coffee. He testified that he did not test if she could smell mercoptan, the odorant in natural gas. He stated he could not testify as to her ability to smell on the day of the fire.
DR. OSCAR FRANKLIN GRIFFITH:
Dr. Oscar Franklin Griffith, professor of physics at the University of New Orleans, testified this was a fuel rich gas fire. He opined from the burn pattern that there were multiple ignition points indicating a sudden flash and simultaneous ignition of a lot of different objects in the room. He could find no gas leaks anywhere in the apartment. He specifically examined the hose line to the stove and found no leaks. He stated there was no way to know the rate at which the gas accumulated prior to the fire. He testified a small leak could take from 15 to 20 hours or longer whereas a ruptured gas line could take as little as 20 minutes.
LEONARD AUCOIN:
Leonard Aucoin, employee of LGS was dispatched on the night of the fire to shut off the gas and remove the meter to Vivi-ano’s apartment. He detected no odor of gas prior to disconnecting the meter which indicated there was no leak going to the meter or coming from the meter. Aucoin testified when he disconnected the meter he could definitely smell the odor of the escaping gas. He described the odor as “... definitely visible. It was strong enough to smell it.”
DR. STANLEY GOLDBERG:
Dr. Stanley Goldberg, Professor of Chemistry at the University of New Orleans, testified relative to the cause of the fire. He opined that since Viviano stated she did not smell the gas before striking the match, the gas must not have been sufficiently odorized. He stated that he has never before testified in a case concerning a natural gas fire. He testified his only knowledge of natural gas distribution and odorization systems was gained from reading literature in the field since being hired to testify in the instant case. He stated he had never examined an odorime-ter (used to measure the amount of odorant in natural gas); made no independent analysis of the properties of the gas distribution by Untied to NOPSI and LGS and made no analysis of the age or condition of the pipelines carrying the gas from United to Viviano’s apartment. Goldberg produced no imperical data in support of his opinion that the gas did not contain sufficient odorant.
He testified that his conclusions were drawn after investigating NOPSI’s injection and monitoring facilities and the procedures used to insure proper odorization. He admitted he did not make a similar study of monitoring procedures used by LGS even though it was LGS, not NOPSÍ who distributed the gas to Viviano’s apartment. In addition he stated that he was not aware of any action by United which materially contributed to the fire.
Dr. Goldberg went into great detail about the widely varying sensitivity levels of smell in the consumer population. He *818 stated the current minimum odorant level of .25 pounds per million cubic feet of gas protects only 70% of the population. He opined that .5 to .75 pounds per million cubic feet of gas would protect 95% of the consumer population.
He further opined that fading of the odorant must have occurred because NOPSI’s monitoring procedures were inadequate. He pointed to the fact that NOPSI had never conducted a study to determine the best location for monitoring stations; that in January and February of 1982 NOPSI used only one employee instead of two to test the odorant level via smell; and that only two of the six check stations in the downtown area were monitored. On cross examination, Dr. Goldberg stated that he found nothing wrong with NOPSI’s equipment or procedures. He stated they were marginal but adequate. He testified that tertiary butyl mercaptan, the odorant used by NOPSI, is the best available in the industry. He opined that one-half of the odorant faded by the time it reached NOPSI’s injection station. This would reduce United’s .42 pounds per million cubic feet to .21 pounds. He admitted the .35 pounds then added by NOPSI would raise the level of odorant to .56 pounds, an amount well above marginal and within the acceptable range. Defense counsel asked Dr. Goldberg if the .56 pound level faded by one-half within the three miles to City Gate 2 where LGS purchased the gas. Dr. Goldberg responded that he had no idea. He stated he did not know if this was an adequate distance between the point of odorization and the point of use. He further testified that he made no calculations regarding the volume of gas or the speed of flow to determine if it was possible for the odorant to have faded from the time Hudson smelled it at 1:00 p.m. and 9:30 p.m. when the fire occurred.
ARTHUR YEAGER, JR.:
Arthur Yeager, Jr., manager of gas operations and engineering for NOPSI, testified that NOPSI has no ownership or possession of the gas purchased by LGS which serviced Viviano’s apartment.
Yeager testified that the gas purchased by NOPSI and LGS is odorized three times before it goes to the consumer. First, United odorizes the gas at its Pointe-a-la-Hache facility; second, United odorized it again at a point along the line that joins the main line from Pointe-a-la-Hache at Delacroix and third, NOPSI odorizes the gas at a point called the Paris Road check station located at Judge Perez Drive three or four blocks below Paris Road.
Yeager stated that after NOPSI odorizes the gas at the Paris Road check station, the gas travels to United’s facility called City Gate 2 on Mehle Street. It is at this point that NOPSI purchases a portion of the gas and LGS purchases a portion of the gas. NOPSI bills LGS for the portion of odorant present in the gas purchased by LGS which NOPSI odorized.
Yeager testified that a person with a normal sense of smell can detect the odo-rant in natural gas when its concentration is 1% by volume if it is odorized at .25 pounds per million cubic feet of gas. He further stated that given the appropriate data, the flow rate of the gas in February, 1982 was .4 million standard cubic feet per hour. At this rate it would take 88 minutes for a molecule of gas to travel the twenty six miles from United’s Pointe-a-la-Hache injection facility to NOPSI’s injection facility at Paris Road. From addition, NOPSI’s No. 18 monitoring station at Gir-od and Burgundy Streets closest to City Gate 2 is 50 years old. Legendre testified that in the nineteen years he has worked for NOPSI, there has never been fading in the pipeline in the Industrial Canal/St. Bernard Parish line area.
Legendre also testified that other components in natural gas — propane, butane, carbon dioxide and nitrogen can cause a phenomenon called masking if they exist in heavy enough concentrations which overpower the odorant.
Legendre testified that NOPSI uses sound monitoring procedures. First, employees visit the odo'rizer installation twice per week to calculate the amount of odo-rant. Second, odorimeter tests are conducted once per month. Third, customer *819 calls reporting leaks are monitored daily as to frequency and location. Fourth, employees turn in odor intensity cards indicating a weak, normal or strong odor at the time a leak call is serviced. These are completed on a daily basis. He stated that odorization logging records for February 14, 1982 showed the level of injection to be .354 pounds per million cubic feet of gas, well above the industry standard. He further testified that customer complaint records showed that on February 13th and February 15th, the days before and after the fire, leak calls were reported in the area where Viviano lived indicating the presence of odorant.
DR. OTHA JOHN JACOBUS:
Dr. Otha John Jacobus was accepted by the court as an expert in natural gas distribution systems, particularly odorization.
Dr. Jacobus testified that a gas fire always flashes back to its origin. Given this fact, he stated the burn pattern indicated the fire started in the kitchen near the stove and then travelled into the bedroom. He also disputed the theory that the gas could have migrated from Hudson’s apartment as no pathway was found through which the gas could have travelled.
Dr. Jacobus stated that NOPSI has nothing to do with the gas that services Vivi-ano’s apartment. This is the responsibility of LGS. He further testified that the pipeline from Pointe-a-la-Hache to City Gate 2 is over 40 years old. The pipe is fully conditioned, resulting in minimal, if any, fading of the odorant. He stated NOPSI uses constant feed injectors resulting in little or no fluctuation of the odorant level. He explained that if .38 to .42 pounds of odorant is injected in any given month, the average odorant level for that month would not fluctuate to any extent. In other words, if United and NOPSI show injection rates of .42 and .35 pounds, respectively, for February, 1982, the level of odorant on February 14, 1982 would be the same.
He stated that even assuming NOPSI’s injectors failed, it would take days, even weeks for the odorant to completely fade because the fresh unodorized gas would pull the odorant off the conditioned pipeline walls. Since leak calls were reported on February 13, 1982 and February 15, 1982, Dr. Jacobus stated, “Absolutely. No question about it. The gas was odorized.” Furthermore, he testified that if Hudson smelled the gas at 1:00 p.m. and Aucoin smelled it at midnight, the gas was odor-ized. He was emphatic that the odorant level could not drop to zero and then rise to a level sufficient enough to be detected in that short period of time. “It is odorized at 1:00 p.m., it is odorized at 12:00, 2:00, 9:00 or 10:00. It’s odorized the whole period of time.”
ASSIGNMENT OF ERROR 1:
Viviano asserts the trial court erred in refusing to instruct the jury on the doctrine of res ipsa loquitur. We disagree.
The doctrine of res ipsa loquitur is important in the scheme of circumstantial evidence. The law is well settled that the applicability of the rule is determined at the conclusion of the trial when the facts suggest that it was the negligence of the defendant that was the most plausible explanation of the damage to the exclusion of every other cause without the necessity of proving the exact negligent act. Boudreaux v. American Insurance Company, 262 La. 721, 264 So.2d 621 (La.1972); King v. King, 253 La. 270, 217 So.2d 395 (La.1968); Larkin v. State Farm Mutual Automobile Insurance Company, 233 La. 544, 97 So.2d 389 (La.1957); Kincade v. Doll, 472 So.2d 60 (La.App. 4th Cir.1985).
Equally well settled is the principle that the application of res ipsa loquitur is defeated if an inference can be drawn that the damage was due to a cause other than defendant’s negligence just as reasonably as one that it was due to his negligence. Boudreaux v. American Insurance Company, supra.; Kincade v. Doll, supra.
In the instant case, after all the evidence was presented, it is abundantly clear that there were several plausible explanations as to the cause of the accident. Viviano’s claim is that the lack of odorization of the gas is the factual basis of causation. Her argument is that “but for” the lack of odor in the gas, she would have *820 smelled it, not lit the cigarette and would not have been injured. However the evidence suggested several other reasonable causes. It was just as plausible to conclude that the gas was odorized but Vivi-ano was unable to smell it; or, that the gas was odorized, Viviano smelled it but didn’t recognize it as natural gas and struck the match; or that she recognized the odor but failed to appreciate the danger.
Under these facts and circumstances we are satisfied that the trial judge did not err in refusing to charge the jury on res ipsa loquitur.
This assignment is without merit.
ASSIGNMENT OF ERROR NO. 4:
Viviano argues the trial judge erred in failing to admit into evidence certain publications relied on by her expert in rendering his opinion. She asserts that the publications would have shown that defendants’ monitoring and odorization procedures fell below state of the art technology at the time of the accident, and that the evidence would have independently verified her expert’s opinion.
The trial court ruled that the publications constituted inadmissible hearsay. Viviano cites Code of Evidence Article 803(18) in support of her argument. That article provides for the admissibility of “learned treatises” which are relied upon by an expert and are established as reliable authority. Assuming arguendo that the excluded publications fall within the “learned treatises” exception and should have been admitted, for the following reasons we determine their exclusion constituted harmless error.
First, the pertinent material contained in the publications was referred to by plaintiff’s expert during his testimony. He clearly identified the publications as the source of much of his knowledge of the subject, and reiterated much of their contents in support of his conclusions. Thus, the relevant thrust of the publications was properly before the jury even though the publications themselves were not admitted in evidence. Even if admitted in evidence, the jury would not have been able to take the documents to the jury room during deliberations. C.E. art. 803(18). Exclusion of the publications merely prevented the verbatim reading of their contents, much of which the jurors already heard through the testimony. Second, and more important is our determination, after review of the evidence, that reading the publications to the jury would not have altered their verdict. Clearly, as discussed below, the evidence strongly supports that verdict.
We find no merit in this assignment. ASSIGNMENTS OF ERRORS 3 AND 5:
The principles of law applicable to appellate review are well settled. A court of appeal may not set aside a finding of fact by a trial court or a jury in the absence of manifest error or unless it is clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989). Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of facts should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Id.
Our Supreme Court has recently reaffirmed these general principles of review in Lirette v. State Farm Insurance Co., 563 So.2d 850, 852 (La.1990). The high court stated:
“When findings are based on determination regarding the credibility of witnesses, the manifest error — clearly wrong standard demands great deference to the trier of fact’s findings; for only the fact finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said, (citations omitted).
[[Image here]]
The rule that questions of credibility are for the trier of fact applies to the evaluation of expert testimony, unless the stated reasons of the expert are patently unsound.”
The above principles require that we affirm the jury’s conclusions. The testimony and evidence clearly preponderates in defendants’ favor.
*821 In support of her assertion that the gas was not odorized, Viviano relies heavily on her own self-serving testimony as well as the testimony of Dr. Goldberg. Dr. Goldberg’s opinions and theories are speculation at best. He conducted no analysis of the piping, the gas, the odorant or the equipment used to odorize the gas. He produced no empirical data.
His testimony was based solely on information he learned from reading symposiums in the field of natural gas and odorization. His conclusion that Viviano did not smell the gas because it was not odorized is simply not supported by the evidence.
Viviano also argues strict liability as well as negligence. An injured party may recover on the basis of strict liability under Civil Code Article 2317 by showing that the thing which caused her damage was in the care or custody of the defendant, that it contained a vice or defect, i.e., some condition which occasioned an unreasonable risk of injury, and that the injury was caused by the defect. Shipp v. City of Alexandria, 395 So.2d 727 (La.1981); Levie v. Orleans Parish School Board, 537 So.2d 351 (La.App. 4th Cir.1988), writ denied 538 So.2d 616 and 538 So.2d 617 (La.1989). Vi-viano failed to prove a vice or defect in the gas, i.e., lack of sufficient odorant. Therefore, strict liability, pursuant to Civil Code Article 2317, is not applicable.
These assignments of error are without merit.
ASSIGNMENT OF ERROR 2:
The standard for a judgment notwithstanding the verdict (N.O.V.) "... requires that the motion be granted only when the evidence points so strongly and overwhelmingly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover.” Scott v. Hospital Service District No. 1 of the Parish of St. Charles, 496 So.2d 270 (La.1986). The evidence is not so overwhelmingly in favor of Viviano to justify interference with the jury’s findings.
Similarly, the basis for the granting of a new trial must be established either by a judgment clearly contrary to the law and the evidence, or the discovery of new evidence which could not have been discovered or obtained before or during the trial. Neither of these factors are present in the instant case.
This assignment of error is without merit.
PRESCRIPTION:
Although we find merit in United and NOPSI’s exceptions of prescription we need not address those issues since they are clearly without fault.
FRIVOLOUS APPEAL:
In answering the appeal, United and NOPSI seek damages for frivolous appeal pursuant to Code of Civil Procedure Article 2164.
“Before damages for a frivolous appeal lie, it must be manifest that the appeal was taken solely for delay or that appealing counsel does not sincerely believe in the view of law he advocates.” Sherman v. B & G Crane Services, 455 So.2d 1275 (La.App. 4th Cir.1984) at 1278.
There is no evidence to substantiate a claim for frivolous appeal in this case. There are both legal and factual issues raised, in good faith, by plaintiff. We therefore reject defendant’s claims of frivolous appeal.
For the foregoing reasons the judgment of the trial court is affirmed. All costs of this appeal to be paid by appellant.
AFFIRMED.

. When polled the jury responded "No" to the question of whether the conduct of NOPSI, United, LGS and the landlords was sub-standard. To the question of whether Viviano’s conduct was sub-standard the jury responded "Yes”.
In assessing fault, the jury assigned 0% to NOPSI, United, LGS and the landlords and 100% to Viviano.